IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| KEVIN L. WATSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:18-cv-00545 |
| | ) | |
| GRAYSON COUNTY SCHOOL BOARD, | ) | By: Elizabeth K. Dillon |
| | ) | United States District Judge |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Pro se plaintiff Kevin Watson alleges that not being hired as the head varsity softball coach at Grayson County High School was discrimination based on his gender in violation of Title VII. The Grayson County School Board moves for summary judgment. For the reasons stated below, the School Board's motion will be denied.

I. BACKGROUND[1]

**A. Watson's Background**

Watson was an assistant varsity softball coach at Grayson County High School from 2008 through 2017. Watson was also the head junior varsity softball coach for the final three years of

---

[1] The court notes that Watson's first brief has a section labeled "Disputed Material Facts," where he takes issue with several of the facts set forth in the School Board's "Statement of Undisputed Material Facts." Most of Watson's responses in that brief are unsupported by evidence in the record. *See* Fed. R. Civ. P. 56(c)(1)(A) (providing that a "party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record"). Also, Watson's brief was not submitted under penalty of perjury, and he did not submit a separate affidavit or declaration. *SeeJefferies v. UNC Reg'l Physicians Pediatrics*, 392 F. Supp. 3d 620, 625–26 (M.D.N.C. 2019) ("A [pro se] party's brief does not constitute evidence that the court can consider on a motion for summary judgment. Similarly, statements . . . that do not subject the author to the penalty of perjury for any misstatements cannot by themselves defeat a summary judgment motion."). After the School Board filed its reply brief, Watson filed an additional brief containing many of the same assertions made in the first brief, but this time, the brief was a sworn affidavit submitted by Watson under penalty of perjury. This additional brief was filed without leave from the court and in violation of the local rules, which allow for an opening brief, a response, and a reply. (*See* Civil L.R. 11(c) (W.D. Va.).) As the court indicated at the hearing, the court will accept the filing and consider the additional brief in consideration of Watson's status as a pro se litigant. In the background section of this opinion, the court has noted where Watson provided admissible evidence that casts doubt upon the School Board's statement of material facts and possibly creates a genuine issue of fact.

that time and spent some time as the eighth grade head coach. (Watson Dep. 20, Dkt. No. 19-1.) Watson spent sixteen years as the high school assistant varsity football coach. (*Id.* at 17.) Although Watson had some experience playing baseball in high school, he had no experience playing softball. (*Id.* at 24–25.) Watson's full-time job is as the Grayson County Recreation Park Director. (Watson Aff. ¶ b, Dkt. No. 25.)

**B. Head Varsity Softball Coach Position**

In 2017, Watson applied for the position of head varsity softball coach at Grayson County High School, which had been posted on the Human Resources webpage at the school division website. He was one of two applicants at the time. (Watson Dep. 26; Declaration of Zack Hill (Hill Decl.) ¶ 3, Dkt. No. 19-2; Declaration of Janice Linker (Linker Decl.) ¶ 3, Dkt. No. 19-3.) The applications were reviewed by Grayson County High School Athletic Director Zack Hill and Principal Robbie Patton. Together, they formed the interview team and selected the candidates to interview and conducted the interviews. (Hill Decl. ¶ 4; Declaration of Robbie Patton (Patton Decl.) ¶ 4, Dkt. No. 19-4.)

Because the head varsity softball coach is the figurehead of the school's softball program, the interview team viewed leadership potential in this position as especially important, even more so than for assistant coach positions. The interview team also expected that the successful applicant would have the ability to coach players regarding the fundamental skills required to play softball, including hitting, pitching, and fielding. Although previous coaching experience was desired, it was not required and not as important as demonstrated leadership potential. (Hill Decl. ¶ 5; Patton Decl. ¶ 5.)

According to the interview team, Watson demonstrated in his interview that he did not

have the leadership qualities required for the position.  His responses lacked details for practice schedules as well as big picture plans for the program.  (Hill Decl. ¶ 6.)  Watson maintains that he gave a detailed practice plan from beginning to end and gave a clear big picture plan for the future of the program.  (Watson Aff. ¶ 1.)  Also, according to the interview team, Watson indicated he did not know enough about coaching pitching to do the job by himself, and so he would have to bring in another coach to assist him.  (Patton Decl. ¶ 6.)  Watson avers that he did not make this statement during the interview and asserts that he coached pitching for nine years in the Grayson County Public School System.  (Watson Aff. ¶ 2.)  The interview team further perceived that Watson talked more about his time as a football player and coach than softball.  (Hill Decl. ¶ 6; Patton Decl. ¶ 6; Watson Dep. 29–30, 39.)  Watson disputes the assertion that he talked more about his time as a football player and coach than softball.  Watson cites the report sent by Janice Linker, the Human Resources Supervisor, dated February 6, 2018, to Superintendent Kelly Wilmore about Watson's complaint of discrimination, which does not mention Watson talking about football.  (*See* Dkt. No. 22-5.)  In his contemporaneous notes during the interview, Hill wrote: "Talked more about Football than Softball???"  (Hill Decl. Ex. 1, Dkt. No. 19-2 at 4.)

During the pendency of Watson's candidacy, Hill received several comments from parents stating that they opposed the hiring of Watson as head varsity softball coach and that their children would quit the team if Watson were hired for the position.  (Hill Decl. ¶ 7.)  Watson notes that, despite being the head coach of the girls headed into the varsity program, he never had any formal complaints or threats of quitting.  (Watson Aff. ¶ 3.)  Hill was also told by the outgoing head varsity coach that he did not support Watson to replace him because Watson lacked the necessary

leadership potential. (Hill Decl. ¶ 7.)

The interview team did not select Watson for the position. Instead, they selected Mark McPherson, a male who was the only other candidate. (Hill Decl. ¶ 8; Patton Decl. ¶ 7.) Pursuant to established procedures for hiring head coaches, Hill forwarded the recommendation of McPherson to Janice Linker, Supervisor of Human Resources. (Linker Decl. ¶ 4.) McPherson's appointment as head varsity softball coach was added to the list of personnel appointments that were submitted to the School Board for approval. (Linker Decl. ¶ 5; Declaration of Kelly Wilmore (Wilmore Decl.) ¶ 6, Dkt. No. 19-5.) The School Board is the formal decisionmaker as to all employees hired by the School Board. (Declaration of Diane Haynes (Haynes Decl.) ¶ 3, Dkt. No. 19-6; Linker Decl. ¶ 6.)

The School Board approved the hiring of McPherson for the head coach position at its meeting on October 9, 2017. (Haynes Decl. ¶ 4; Linker Decl. ¶ 7.) McPherson, however, ultimately turned down the position. (Hill Decl. ¶ 9.) As a result, the position was reposted and additional candidates were interviewed. (Hill Decl. ¶ 10; Patton Decl. ¶ 9.) Members of the School Board indicate that they fielded comments from the public that opposed Watson's candidacy for head varsity softball coach once it was known that the position was open again. (Haynes Decl. ¶ 5.) Several members of the School Board approached Hill to inform him of the opposition to Watson filling the head coach role. This, according to Hill, reinforced the interview team's conclusion that Watson was not a good fit for the position. (Hill Decl. ¶ 11.)[2] Watson was not interviewed in the second round of interviews.

After the second round of interviews, the interview team selected Amanda Smith Miller, a

---

[2] Watson argues that this statement is not supported by the letter sent to him from the School Board, which states, "it was clear that the Principal and the Athletic Director (Mr. Hill) had determined that you would not be a good fit for the Varsity Softball Head Coach position, based on your interview." (Dkt. No. 22-6.)

4

female.   The interview team purportedly based its decision to hire Miller on her experience and reputation as a successful player, which included playing at the collegiate level and earning All-American and State Player of the Year honors.   Miller also had pitching experience.   Miller had a strong interview performance and demonstrated the desired leadership potential for the head varsity coach position.   While Miller did not have coaching experience outside of clinics and recreation leagues, the interview team gave great weight to her experience and accolades as a player and her ability to articulate a vision for the softball program.   (Hill Decl. ¶ 12; Patton Decl. ¶ 10.)

Hill forwarded Miller's name to Linker, who added Miller's name to the list of personnel appointments that were submitted to the School Board.   (Linker Decl. ¶ 9.)   The School Board approved Miller as the head varsity softball coach at its meeting on January 15, 2018.   (Haynes Decl. ¶ 6; Linker Decl. ¶ 10.)

Superintendent Kelly Wilmore and the members of the interview team maintain that Wilmore never provided any input or attempted to influence the interview team's selection. (Wilmore Decl. ¶ 8; Hill Decl. ¶ 13.)   Regarding Wilmore's responsibilities as Superintendent, the Grayson County Public Schools Policy Manual provides that the School Board "places the primary responsibility and authority for the administration of the school division in the superintendent . . . . The School Board expects the division superintendent to provide leadership" in "Decision-making" and "communication."   (Dkt. No. 22-2.)   Listed under "Qualifications and Duties for the Superintendent" was the expectation that the Superintendent "oversees staff personnel management, including by organizing recruitment of personnel."   (Dkt. No. 22-3.) Also, under the Administrative Organization Plan, the "legal authority of the Grayson County

5

School Board is transmitted through the Superintendent."   (Dkt. No. 22-4.)

### C.  Watson Inquires About the Hiring Decision

Watson spoke with Hill on January 11, 2018.   Hill confirmed that that Miller was offered the position.   (Watson Dep. 40–41.)   When Watson asked why Miller had been hired instead of him, Hill said it was now "over [his] head."   Hill states that he meant by this comment that the decision was out of his hands because the name had been passed along to the Superintendent and would be submitted to the School Board.   (Hill Decl. ¶ 15.)   Watson maintains that Hill did not say that the decision was "now" over his head.   (Watson Aff. ¶ 6.)   Watson cites Linker's February 6, 2018 letter to Wilmore, which relayed that Hill stated that the decision was "over his head," not that it was "now" over his head.   (Dkt. No. 22-5.)

Watson spoke to Wilmore the following day, January 12, 2018, on the telephone.   Watson asked Wilmore why Miller was offered the position over him.   Wilmore states that at the time of this conversation he did not have any knowledge of Watson's interview performance or the reason for the interview team's decision.   (Wilmore Decl. ¶ 9; Watson Dep. 44.)   Wilmore told Watson that one reason was that they were looking for a female coach.   (Watson Dep. 44.)   After the phone call from Watson, Wilmore had a brief conversation with the interview team and learned that Watson had performed poorly in the interview.   (Wilmore Decl. ¶ 10.)

On January 15, 2018, Watson visited Wilmore in his office and asked him again why Miller had been hired over him.   Wilmore maintains that he was uncomfortable being confronted by Watson and wanted to spare Watson's feelings and make the decision not to hire him seem less personal.   (*Id.* ¶¶ 11–12.)   Wilmore said, "I think one thing was that a female coach they thought would be an excellent opportunity," and "I don't know, I guess that's just my guess is just trying to

6

get a female coach." Wilmore also said, "I don't think it's anything against you, you can't help you're not a female, I think that it really seemed like that was one of the things." (*Id.* ¶ 13.) Wilmore states that the interview team did not tell him that sex was a reason for their decision. (*Id.* ¶ 14.)

On the same day, Watson spoke on the phone with School Board member Randy Shinault. Watson told Shinault about the gender comments made by Wilmore. Shinault told Watson that Wilmore should not have said that, but that the board had been having discussions about hiring more female coaches. (Watson Dep. 118–19, Dkt. No. 23-1; Watson Aff. ¶ a.)

After his January 15 meeting with Watson, Wilmore states that he learned more from the interview team about Watson's poor interview performance. Wilmore contacted Watson approximately one week after meeting with Watson in his office and informed Watson what he had learned from the interview team about Watson's poor interview performance. (Watson Decl. ¶ 16.)

Watson voluntarily resigned his position as the head junior varsity softball coach in early 2018, before the season began. He was not asked to resign or forced to resign. He could have continued coaching if he chose to do so. (Watson Dep. 116–17.)

### D. Watson's Discrimination Complaint to the School Board

Watson made a formal Report of Discrimination with the School Board on January 22, 2018, which was investigated by Linker in her capacity as Compliance Officer. In her written report dated February 6, 2018, Linker concluded that Hill and Patton did not discriminate against Watson in their decisions. (Linker Decl. ¶ 12.) Watson appealed this determination to the School Board. The School Board, upon considering documents and Watson's oral argument,

upheld the finding of no discrimination and noted that Hill and Patton determined that Watson would not be a good fit for the position based on his interview.  It further found that Wilmore's comments regarding gender preference did not have an impact on the recommendation of Miller to the School Board or the School Board's approval of her to fill the position.  (Haynes Decl. ¶ 7, Ex. 1.)

## II.  ANALYSIS

### A.  Motion for Summary Judgment

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute of material fact is "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party.  *Anderson*, 477 U.S. at 248–49.

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c), 56(e).  All inferences must be viewed in a light most favorable to the non-moving party, but the nonmovant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."  *Beale v. Hardy*, 769 F.2d 213,

8

214 (4th Cir. 1985).

## B. Title VII

Title VII makes it unlawful for an employer to take an adverse employment action against an individual, such as a refusal to hire, because of that person's sex. 42 U.S.C. § 2000e-2(a)(1). There are two ways a plaintiff may prevail in an action for employment discrimination: he can either present evidence (direct or indirect) that his employer had a discriminatory motive when it initiated an adverse employment action against him, or he can engage in the familiar, three-step burden-shifting approach first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 213–14 (4th Cir. 2007). It is not necessary to walk through the steps of the burden-shifting approach because Watson has put forward direct evidence of a discriminatory motive.

To overcome summary judgment based upon direct or indirect evidence of discrimination, a plaintiff "must produce direct evidence of a stated purpose to discriminate and/or circumstantial evidence of sufficient probative force to reflect a genuine issue of material fact." *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988); *see also Rayyan v. Va. Dep't of Transp.*, 719 F. App'x 198, 202 (4th Cir. 2018). The evidence must directly reflect the alleged discriminatory attitude and "bear directly on the contested employment decision." *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101–02 (2003). Put differently, the plaintiff "must produce evidence that clearly indicates a discriminatory attitude at the workplace and must illustrate the nexus between that negative attitude and the employment action." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999), *abrogated on other grounds by Desert Palace*, 539 U.S. at 101–02; *see also Warch*

9

*v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (stating that the "discriminatory attitude . . . must have a nexus with the adverse employment action").

Watson has provided direct evidence of discriminatory intent: Superintendent Wilmore's comments to Watson on the phone on January 12, 2018, about there being a preference for a female softball coach, and Wilmore's follow-up comments to the same effect during an in-person meeting on January 15, 2018.  These statements were further corroborated by School Board member Randy Shinault, who confirmed to Watson that the School Board was considering hiring more female employees.  The School Board attempts to minimize Wilmore's comments by arguing that Wilmore was not the decisionmaker in the hiring process.  The School Board also argues that when Wilmore first told Watson that gender may have been a factor in the decisionmaking process, Wilmore did not know the real reasons that the interview team passed over Watson for the position.  On the second occasion, the in-person meeting with Watson, Wilmore had acquired more knowledge about the interview team's reasoning, but Wilmore was uncomfortable being truthful with Watson and was trying to make the decision seem less personal.  Even if Wilmore was not involved in the hiring process, Wilmore obviously knew the people involved in the hiring process, who worked under Wilmore's general supervision.  Whether Wilmore was relaying what he heard or knew, or speculating without knowledge and trying to let Watson down easily, is a credibility issue for a jury, not something the court can resolve in a summary judgment motion.

### III.  CONCLUSION

Because there is a genuine issue of material fact under the direct method of proving discrimination, the Grayson County School Board's motion for summary judgment (Dkt. No. 18)

is DENIED.

    Entered: August 10, 2020.

    /s/ Elizabeth K. Dillon
    Elizabeth K. Dillon
    United States District Judge